UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

GREGORY LEAVITT,          )
                            )
        Plaintiff,        )
                            )
        v.             )      1:10-cv-00030-JAW
                            )
SW&B CONSTRUCTION   )
COMPANY, LLC,        )
                            )
        Defendant.    )

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Because a former employee of a construction company failed to make out a prima facie case that he was terminated in violation of either the association or retaliation provision of the Americans with Disabilities Act (ADA), the Court grants his employer's motion for summary judgment.

## I.    STATEMENT OF FACTS[1]

### A.    Procedural Background

On December 19, 2009, Gregory Leavitt filed a complaint against SW&B Construction Company (SW&B) in Somerset County Superior Court, alleging a violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.,* and multiple violations of the Americans with Disabilities Act (ADA), 42 U.S.C § 12101 *et seq.  Notice of Removal* (Docket # 1) at Attach. 1, *State Court Compl.*  On January, 10 2010, SW&B removed this case to United States District Court.  *Notice*

---

[1] In accordance with "conventional summary judgment praxis," the Court recounts the facts in the light most favorable to Mr. Leavitt's theory of the case consistent with record support.  *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002).  Consistent with this obligation, the Court recites certain events as facts even though SW&B disputes them.

*of Removal.* On April 13, 2010, Mr. Leavitt filed an amended complaint, which alleged the same violations as the initial complaint. *First Am. Compl.* (Docket # 12) (*Compl.*). On August 11, 2010, SW&B moved for summary judgment on all claims. *Def. SW&B Construction Co.'s Mot. for Summ. J.* (Docket # 16) (*Def.'s Mot.*). On September 20, 2010, Mr. Leavitt responded in opposition to SW&B's motion for summary judgment. *Pl,'s Mem. of Law in Opp'n. to Def.'s Mot. for Summ. J.* (Docket # 23) (*Pl.'s Opp'n.*). On September 28, 2010, SW&B replied to Mr. Leavitt's opposition. *Def.'s Reply Mem. in Supp. of Mot. for Summ. J.* (Docket # 30) (*Def.'s Reply*).

At oral argument on February 11, 2001, Mr. Leavitt's counsel raised issues that had not been fully briefed, including the impact of *Thompson v. North American Stainless, LP*, 131 S. Ct. 863 (2011), a case the United States Supreme Court decided on January 24, 2011, and the effect of *Quint v. Staley Mfg, Co.*, 172 F.3d 1 (1st Cir. 1999) on the pending motion. The Court suggested that counsel file post-hearing memoranda and they did so. *Pl.s Post-Arg. Mem. of Law on Def.'s Mot. for Summ. J.* (Docket # 42) (*Pl.'s Post-Arg. Mem.*); *Def.'s Resp. to Pl.'s Post-Argument Mem.*) (Docket # 43) (*Def.'s Resp.*).

## B. Mr. Leavitt's Employment Background

From 1995 until the end of 2006, Mr. Leavitt worked as a safety director[2] for BE&K Construction Company (BE&K), a subsidiary of BE&K, Inc., at its

---

[2] The parties dispute whether Mr. Leavitt's title at BE&K Construction was "safety coordinator" or "safety director." Mr. Leavitt says he was safety director; SW&B says he was safety coordinator. PSAMF ¶ 30; DRPSAMF ¶ 30. The distinction is not important for the purposes of this motion, but

continuing presence operations at a paper mill in Jay, Maine (Jay site).[3] *Pl.'s Statement of Additional Facts* ¶ 30 (Docket # 25) (PSAMF); *SW&B's Reply to Mr. Leavitt's Additional Facts* ¶ 30 (Docket # 31) (DRPSAMF). On January 1, 2007, SW&B Construction Company, LLC (SW&B), another subsidiary of BE&K, Inc. assumed operation of the Jay site, at which time Mr. Leavitt became employed as safety coordinator[4] of SW&B at Jay. PSAMF ¶ 32; DRPSAMF ¶ 32. Todd Meek, the corporate Safety Director for SW&B, was his supervisor; he also reported to Kenneth Morgan, SW&B's project manager. *Def.'s Statement of Material Facts* ¶ 2 (Docket # 17) (DSMF); *Pl.'s Opp'n to Def.'s Statement of Material Facts* ¶ 2 (Docket # 25) (PRDSMF).

From 1995 to 2007, Mr. Morgan repeatedly approved pay increases for Mr. Leavitt and consistently evaluated his performance positively. PSAMF ¶¶ 33-38; DRPSAMF ¶¶ 33-38. During that same period, BE&K published articles praising his work and the work of other employees for achieving recognition from OSHA.

consistent with its duty to present the facts in the light most favorable to Mr. Leavitt, the Court refers to his position at BE&K as "safety director."

[3] The parties' statements of material fact frequently reference BE&K without clarifying whether they are referring to BE&K Construction or BE&K, Inc. Because the Court is unable to make this distinction on its own, it refers to both entities as BE&K, except where the parties specifically identify one of the two entities.

[4] The parties dispute whether Mr. Leavitt's title at SW&B was "safety coordinator" or "safety director." PSAMF ¶ 31; DRPSAMF ¶ 31. Mr. Leavitt's record citation in PSAMF ¶ 31 does not support his statement that he was "safety director" at SW&B and SW&B's record citation in DRPSAMF ¶ 31 supports the designation of "safety coordinator." In his deposition, Mr. Leavitt says he was the safety coordinator at SW&B:

Q. No, when you were with SW&B in 2007, what was your job then?
A. Safety coordinator.

*Additional Attachments By Gregory Leavitt* (Docket # 28) at Attach. 11 (*Leavitt Dep.*) at 15:17-19.

The Court uses Mr. Leavitt's description of his position at SW&B.

PSAMF ¶ 39; DRPSAMF ¶ 39.  In a 2005 article, Bob Fitzgerald, BE&K's corporate safety manager, stated, "Ken Morgan, site manager, and Greg Leavitt, safety manager, have done a great job."  PSAMF ¶ 39; DRPSAMF ¶ 39.

## C.    Tally Leavitt's Workers' Compensation Claim

In July 15, 2002, Mr. Leavitt's wife, Tally Leavitt, who worked as an expediter for BE&K Construction, suffered a work-related injury to her right arm. PSAMF ¶ 43; DRPSAMF ¶ 43.  As safety director, Mr. Leavitt assigned Ms. Leavitt to light clerical work and cleaning tasks in the office.  PSAMF ¶ 44; DRPSAMF ¶ 44.  Ms. Leavitt was laid off in October 2002 and was not recalled in December 2002 when other laid off employees were recalled.  PSAMF ¶ 44; DRPSAMF ¶ 44.  In May 2003, Ms. Leavitt filed a claim for workers' compensation benefits against BE&K Construction.  PSAMF ¶ 45; DRPSAMF ¶ 45.  In October 2003, she filed a petition for award of workers' compensation benefits and a petition to remedy discrimination under section 353 of the Maine Workers' Compensation Act.  PSAMF ¶ 46; DRPSAMF ¶ 46.

Valerie Camp, in-house counsel for BE&K, handled the legal aspects of workers' compensation claims against the company.  PSAMF ¶ 40; DRPSAMF ¶ 40.  Mr. Morgan oversaw the reporting of claims at the Jay site, and ensured that injured workers received medical treatment and that information went to the right people.  PSAMF ¶ 41; DRPSAMF ¶ 41.  Mr. Leavitt was responsible for managing employees' claims for workers' compensation, including helping them receive

medical treatment, ascertaining their restrictions, and communicating with Ms. Camp and insurance claims managers.  PSAMF ¶ 42; DRPSAMF ¶ 42.

Ms. Camp communicated with Mr. Morgan regarding Ms. Leavitt's workers' compensation claim and informed him that Ms. Leavitt had a claim pending.[5] PSAMF ¶ 47; DRPSAMF 47.  Mr. Leavitt initially handled his wife's workers' compensation claim; however, he was later removed from the case because of their relationship.[6]  PSAMF ¶ 48; DRPSAMF ¶ 48.

In December 2003, Ms. Leavitt's attorney listed Mr. Leavitt as one of her witnesses at a May 24, 2004 workers' compensation hearing.  PSAMF ¶ 49; DRPSAMF ¶ 49.  Mr. Leavitt understood that he was to testify about Ms. Leavitt's restrictions and what he and BE&K did regarding those restrictions.  PSAMF ¶ 50; DRPSAMF ¶ 50.  BE&K also listed Mr. Leavitt as well as office manager Lucille Partridge as witnesses on its behalf.  PSAMF ¶ 51; DRPSAMF ¶ 51.  Sometime before the hearing, Mr. Leavitt expressed concern to corporate safety director, Rich Baldwin, and to Mr. Fitzgerald about the impact on his job of his involvement in Ms. Leavitt's case.  PSAMF ¶ 52; DRPSAMF ¶ 52.  He asked whether he would still have a job if he testified or if his wife settled her claim.  PSAMF ¶ 52; DRPSAMF ¶ 52.  Mr. Baldwin informed Mr. Leavitt that the claim was handled by the legal

---

[5] SW&B qualifies this statement of fact, saying, "Mr. Morgan had one brief telephone conversation with Valerie Camp who stated that Tally Leavitt had filed a worker's compensation claim, 'and that was it.'"  DRPSAMF ¶ 47.  SW&B's qualified response does not contradict statement of material fact paragraph 47 and the Court treats it as admitted.

[6] SW&B qualifies this statement.  It says that Mr. Leavitt stopped managing Ms. Leavitt's case because she had been laid off, not because of his relationship with her.  DRPSAMF ¶ 48.  Mr. Leavitt testified as such in the cited portion of his deposition.  *Leavitt Dep.* at 75:27.  However, he further testified that he usually managed ongoing workers' compensation cases after an employee had been laid off in case the employee should return back to work.  He stated that he did not do so with his wife's case because of his "affiliation" with her.  *Leavitt Dep.* 75:1676:2.

5

department but that his involvement was not going to affect his job. PSAMF ¶ 53; DRPSAMF ¶ 53. The day before the May 24, 2004 hearing, Mr. Morgan came into Mr. Leavitt's office and asked Mr. Leavitt what he was going to say at the hearing.[7] PSAMF ¶ 54. Mr. Leavitt testified that he perceived Mr. Morgan's questioning as hostile and it made him fearful that BE&K might terminate his employment. PSAMF ¶ 55; DRPSAMF ¶ 55.

At the May 24, 2004 hearing, Mr. Leavitt testified in support Ms. Leavitt's workers' compensation claim. PSAMF ¶ 56; DRPSAMF ¶ 56. Among other things, he testified that Mr. Morgan and others pressured him to return Ms. Leavitt to work in her regular job rather than in alternative assignments, and that there were alternative work assignments that BE&K could have offered her. PSAMF ¶ 56; DRPSAMF ¶ 56. Ms. Partridge also testified at the hearing. PSAMF ¶ 57; DRPSAMF ¶ 57. She explained why BE&K did not recall Ms. Leavitt to employment after it laid her off. PSAMF ¶ 57; DRPSAMF ¶ 57. On August 11, 2004, the Hearing Officer of the Workers' Compensation Board denied Ms. Leavitt's petition to remedy discrimination and granted her petition for award for partial incapacity benefits from April 1, 2003 onward. PSAMF ¶ 58; DRPSAMF ¶ 58.

In 2005, Ms. Leavitt petitioned for increase of benefits due to increasing incapacity. PSAMF ¶ 59; DRPSAMF ¶ 59. That petition was set for hearing at several dates in 2006 and 2007. PSAMF ¶ 59; DRPSAMF ¶ 59. On August 10, 2006, Counsel for BE&K Construction was informed that Mr. Leavitt would be

---

[7] SW&B denies this conversation took place. However, Mr. Leavitt's version is supported in the record, and the Court recounts the facts in the light most favorable to him.

called as a witness to testify to Ms. Leavitt's inability to use her arms to perform household chores, to Mr. Leavitt's knowledge of light duty work at BE&K, and to Mr. Leavitt's inquiries to BE&K about whether work was available for Ms. Leavitt. PSAMF ¶ 63; DRPSMF 63.

From 2006 continuing through at least June 2008, Ms. Leavitt had cumulative trauma disorder of her upper right extremity, tendinitis including flexor pollicis longus and DeQuervain's, myofacial pain syndrome, and median radial nerve irritation. PSAMF ¶ 60; DRPSAMF ¶ 60. Her health condition substantially limited her ability to perform manual work, to care for and dress herself, to drive, and to perform household chores. PSAMF ¶ 61; DRPSAMF ¶ 61. Dr. Peter Esponnette testified that Ms. Leavitt's chronic pain condition substantially limited her ability to perform her job as truck driver and expediter, and substantially limited her ability to perform any other jobs that required manual tasks.[8] PSAMF ¶ 62; DRPSAMF ¶ 62.

Before a September 2007 hearing on the petition to increase Ms. Leavitt's benefits, Mr. Leavitt informed either Mr. Morgan or Ms. Partridge that he needed to testify at a hearing and had to take a day off. PSAMF ¶ 62; DRPSAMF ¶ 67; *Leavitt Dep.* 94:1795:9. At the hearing on September 12, 2007, he testified as to Ms.

---

[8] SW&B moved to strike the statement that Dr. Esponnette was of the opinion that Ms. Leavitt had a disability under the meaning of the ADA. PSAMF ¶ 62; DRPSAMF ¶ 62. The Court grants that request to strike in part. Dr. Esponnette's opinion that Ms. Leavitt was disabled within the meaning of the ADA is a legal conclusion. Expert witnesses may not draw legal conclusions, as it is the province of the Court to explain the law. *See Broussard v. University of California, at Berkeley,* 192 F.3d 1252, 1258 (9th Cir. 1999) (finding that expert's analysis was flawed because it drew the legal conclusion that plaintiff was substantially impaired in her ability to perform a class of jobs by reciting statutory language and concluding that plaintiff was thus disabled as defined by the ADA). At the same time, Dr. Esponnette's opinion that Ms. Leavitt was disabled from a medical standpoint is competent evidence on the question of Ms. Leavitt's disability under the ADA.

Leavitt's increasing incapacity, increasing pain, depression, and difficulty performing household chores and caring for herself. PSAMF ¶ 68; DRPSAMF ¶ 68.

On November 21, 2007, the Workers' Compensation Hearing Officer issued a decision, finding that Ms. Leavitt's incapacity had increased and awarding her 100% partial incapacity benefits retroactive to October 31, 2006, thus increasing her benefits. PSAMF ¶ 71; DRPSAMF ¶ 71. The decision was delivered to Ms. Partridge at SW&B. PSAMF ¶ 72; DRPSAMF ¶ 72. Between January 2008 and June 2008, Ms. Leavitt's counsel negotiated with BE&K's counsel and insurer over the potential settlement of her workers' compensation claim. PSAMF ¶ 73; DRPSAMF ¶ 73. On June 5, 2008, Ms. Leavitt's counsel reached agreement with BE&K and its insurer to settle her claim. PSAMF ¶ 102; DRPSAMF ¶ 102. On August 8, 2008, the Workers' Compensation Board approved the settlement. PSAMF ¶ 106; DRPSAMF ¶ 106.

BE&K, Inc. provided workers' compensation insurance coverage to SW&B, and the two companies had the same workers' compensation insurer. PSAMF ¶ 74; DRPSAMF ¶ 74. SW&B's legal department received notice of the November 2007 decree on Mrs. Leavitt's claim for increased benefits, as well as the proposed settlement of that claim. PSAMF ¶ 66; DRPSAMF ¶ 66. After SW&B assumed operation of the Jay site in January 2007, Ms. Partridge kept a file on Ms. Leavitt's workers' compensation case, even though Ms. Leavitt no longer worked there and it was not Ms. Partridge's job to keep files on employees who had workers'

compensation claims.[9]  PSAMF ¶ 65; DRPSAMF ¶ 65.  Valerie Camp also kept a file on Ms. Leavitt's workers' compensation claim.  PSAMF ¶ 66; DRPSAMF ¶ 66.  Mr. Martin and Mr. Meek never knew about Ms. Leavitt's disability, her workers' compensation claims against BE&K, or the settlement of the claim.[10]  DSMF ¶ 28; PRDSMF ¶ 28.

### D.    Injuries and Worker's Compensation Claims at SW&B in 2008

An employer's Experience Modification Rating (EMR) is one of the criteria for a business winning new business and repeat business.  PSAMF ¶ 76; DRPSAMF ¶ 76.  A low EMR drives down the cost of doing business.  PSAMF ¶ 76; DRPSAMF ¶ 76.  An EMR is negatively impacted by the payment of workers' compensation claims.  PSAMF ¶ 76; DRPSAMF ¶ 76.  SW&B's OSHA statistics and safety record

---

[9] SW&B denies this statement of fact, stating that "Ms. Partridge had nothing to do with Tally Leavitt's worker's compensation claims.  For some unknown reason, she was copied on some materials concerning the claims which she put in a file without reading them.  She did not show those materials to anyone."  DRPSAMF ¶ 65.  This does not contradict Mr. Leavitt's statement, and the Court recounts the facts in the light most favorable to Mr. Leavitt.  SW&B also denies the portion of PSAMF ¶ 65 that says "SW&B's president, James McKusick was aware that Mr. Leavitt's wife had a workers' compensation claim pending, although he could not remember when he learned that fact."  PSAMF ¶ 65; DRPSAMF ¶ 65.  The statement of fact suggests that Mr. McKusick knew of Ms. Leavitt's workers' compensation claim at the time the claim was pending.  However, the cited portion of the record indicates that he was aware of the claim at the time of his deposition but was not aware of her claim at the time Ms. Leavitt had a claim against BE&K.  *Additional Attachments Filed by Gregory Leavitt* (Docket # 27) at Attach. 28 (*McKusick Dep.*) at 111:18112:20.

[10] Mr. Leavitt purports to deny this fact.  Mr. Leavitt cites his entire statement of additional facts in denying this paragraph, along with paragraphs 19, 20, 25, and 26 of SW&B's statement of material facts.  Pursuant to District Local Rule 56, the Court is not obligated to consider such general citations to the record.  D. ME. LOC. R. 56(f) ("An assertion set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion").  However, in the interest of resolving this motion on its merits, the Court has reviewed Mr. Leavitt's additional facts and their attendant citations in search of substantiation of his denials.  Where a reasonable search of those facts has not revealed such substantiation, the Court treats those facts as admitted.

Here, the Court is unable to find any support for the assertion that Mr. Meek or Mr. Martin knew anything about Ms. Leavitt's claim, disability, or settlement.  Mr. Leavitt's citations to the record only indicate that Mr. McKusick learned about Ms. Leavitt's worker's compensation claim at some point.  However, Mr. McKusick stated that he did not know about it "at the time," indicating that he did not know about the claim during its pendency.  *McKusick Dep.*  at 111:18112:20.

were important, both for it to win new business and to keep existing business. PSAMF ¶ 77; DRPSAMF ¶ 77. SW&B advertises its safety record as outstanding in the industry, and some of its clients set minimum requirements as to injury rates. PSAMF ¶ 77; DRPSAMF ¶ 77.

SW&B maintained several sets of records on its injury rates, incidence rates, and total incident rates.[11] PSAMF ¶ 79; DRPSAMF ¶ 79. In one of those records for 2008, the OSHA 300 log, SW&B reported that it had nine OSHA recordable injuries, and only one that required days away from work. PSAMF ¶ 79; DRPSAMF ¶ 79. In another summary for 2008, SW&B reported that it had only five cases requiring days away from work, restrictions, or job transfer. PSAMF ¶ 79; DRPSAMF ¶ 79. In SW&B's accident summary and safety performance reports, as of April 4, 2008, SW&B reported no first aids and three OSHA recordable cases.[12] PSAMF ¶ 81; DRPSAMF ¶ 81. In its OSHA 300 report for 2008, SW&B reported it had only two recordable injuries during that period. PSAMF ¶ 81; DRPSAMF ¶ 81

---

[11] Mr. Leavitt also posits that thirteen SW&B employees filed workers' compensation claims in 2008, and seven were terminated that same year. PSAMF ¶ 78. SW&B denies these statistics as unsupported by the record citations. DRPSAMF ¶ 78. Mr. Leavitt cites hundreds of pages of attachments that are in many instances haphazardly organized and difficult to read. Although such voluminous citation violates District Local Rule 56(f), D. ME. LOC. R. 56(f) ("An assertion set forth in a statement of material facts shall be followed by a citation to the specific page or paragraph of identified record material supporting the assertion"), the Court carefully examined the documents to determine whether the fact was supported. The cited documents contain medical records, incident and injury reports, insurance claims, and other miscellaneous information pertaining to thirteen individual employees who were injured in 2008. For some employees, there are documents pertaining to workers' compensation claims; for others, there is no reference to workers' compensation whatsoever. Despite its obligation to view the facts in the light most favorable to Mr. Leavitt, the Court cannot infer that every employee who was injured in 2008 filed a workers' compensation claim. The numbers he cites are not supported, and the Court disregards paragraph 78 of Plaintiff's Statement of Material Fact.

[12] SW&B denies this as unsupported in the record citations. DRPSAMF ¶ 81. Although Mr. Leavitt's citation to a forty-eight page attachment is again in contravention of Local Rule 56(f), D. ME. LOC. R. 56(f), the attachment sequentially laid out SW&B's 2008 "Accident Summary and Safety Performance Reports" such that the Court could easily ascertain that the assertion is supported.

Between January 2008 and March 31, 2008, three SW&B Employees[13] suffered OSHA recordable occupational injuries. PSAMF ¶ 80; DRPSAMF ¶ 80. On January 28, 2008, Injured A's teeth were broken when he was struck in the mouth. Neither Mr. Meek nor SW&B's president, James McKusick, attributed the accident to Mr. Leavitt. PSAMF ¶ 82; DRPSAMF ¶ 82.

On March 13, 2008, Injured B fell from a ladder at work and injured his left foot and ankle. PSAMF ¶ 83; DRPSAMF ¶ 83. On March 18, 2008, Dr. Samuel Scott, a surgeon, diagnosed Injured B with a fractured left fibula and instructed Injured B to stay home from work for two weeks.[14] PSAMF ¶ 83; DRPSAMF ¶ 83.

---

[13] The names of the injured employees have been redacted to protect their privacy. The Court refers to them as Injured A, Injured B, and Injured C.

[14] SW&B objects to Plaintiff's Statement of Material Fact paragraph 83 on the grounds that Injured B was not identified as a person with knowledge in Mr. Leavitt's Initial Disclosure. DRPSAMF ¶ 83. Rule 26(a)(1)(A) provides that:

> Except as exempted by Rule 26(a)(1)(B) or as otherwise stipulated or ordered by the court, a party must, without awaiting a discovery request, provide to the other parties: (i) the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.

FED. R. CIV. P. 26(a). "Rule 37(c)(1) enforces Rule 26(a)." *Poulis-Minott v. Smith*, 388 F.3d 354, 358 (1st Cir. 2004). Rule 37(c)(1) provides that "If a party fails to provide information or identify a witness as required by Rule 26(a) . . . the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). The First Circuit has recognized that Rule 37(c)(1) "clearly contemplates stricter adherence to discovery requirements, and harsher sanctions for breaches of this rule, and the required sanction in the ordinary case is mandatory preclusion." *Lohnes v. Level 3 Communications, Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) (internal quotations omitted). "[T]he rule's phraseology applies with equal force to motions for summary judgment." *Id.*

The Court is convinced that the failure to disclose Injured B's identity was substantially harmless. Although not identifying Injured B by name, Mr. Leavitt referred to Injured B, his injury, and SW & B's response to the injury from its first interrogatory. *See Pl.'s Rule 56(e) Resp. to Def.'s Objs. to Pl.'s Additional Statements of Material Fact* at 2 (Docket # 32) (*Pl.'s Rule 56(e) Resp.*)) From that time forward, SW&B was on notice that Injured B would be involved in Mr. Leavitt's presentation of his case. SW&B knew Injured B's name and had an employment file on him. *Pl.'s Rule 56(e) Resp.* at 2-3. At no point was SW&B in the dark as to who Injured B was, and it had ample opportunity to obtain testimony from him.

Mr. Meek and Lorin Martin, SW&B's Senior Project Manager for the Jay site, sought another opinion from Dr. Scott. PSAMF ¶ 84; DRPSAMF ¶ 84. This resulted in Dr. Scott providing a lighter work restriction for Injured B, allowing him to return to work immediately, so long as he kept his foot elevated above his heart. PSAMF ¶ 84; DRPSAMF ¶ 84. When Injured B returned to work on March 18, 2008, he spent several hours of each day with his foot elevated above his heart but was also assigned tasks that required him to lower his foot below his heart for several hours each day.[15] PSAMF ¶¶ 85-86; DRSAMF ¶¶ 85-86. For a roughly two-week period between March 18, 2008 and June 11, 2008, Injured B was allowed to receive full pay for working half days. PSAMF ¶ 87; DRPSAMF ¶87. On its OSHA 300 log for 2008, SW&B did not identify any days Injured B missed work, was subject to restrictions, or was subject to a job transfer.[16] PSAMF ¶ 90; DRPSAMF ¶ 90.

On June 11, 2008, SW&B laid off Injured B, citing a reduction in force. PSAMF ¶ 88; DRPSAMF ¶ 88. Injured B was the only employee in the electrical department laid off; other electricians in the department with less seniority kept

---

[15] SW&B requests to strike paragraphs 85 and 86 of the Mr. Leavitt's statement of material facts because they are irrelevant. This request is denied. The facts are relevant—particularly in a summary judgment motion in which the Court views the facts in the light most favorable to the plaintiff—because they inform Mr. Leavitt's theory of causation. Mr. Leavitt seeks to strike paragraphs 87, 88, 89, 90, 92, 93, 94, 107, 108, and 109 on the same grounds. With the exception of paragraph 109 and portions of paragraph 107, those requests are denied for the same reasons. Paragraph 109 is struck because it consists solely of conclusory opinions, which are not helpful to the disposition of this motion. A Portion of paragraph 107 is struck because its probative value is not evident and it serves only to confuse. For example, paragraph 107 says that SW&B did not identify an injured employee as having lost time from work due to occupational injury. However, since there is no indication that the injured employee actually lost time from work, that statement serves no apparent purpose.

[16] SW&B denies this fact as unsupported by the record citations. The fact is clearly supported in the OSHA 300 log provided by Mr. Leavitt, and the Court recounts the facts in the light most favorable to Mr. Leavitt.

their jobs. PSAMF ¶ 88; DRPSAMF ¶ 88. At the time he was laid off, Injured B was still experiencing pain in his foot and was still in a cast. PSAMF ¶ 87; DRPSAMF ¶ 87. SW&B hired another electrician on June 21, 2008.[17] PSAMF ¶ 89; DRPSAMF ¶ 89.

On March 27, 2008, Injured C, an expediter, was injured at the work site when he slipped on ice, fell, and hit his head on a backhoe bucket. PSAMF ¶ 91; DRPSAMF ¶ 91. SW&B's analysis of the cause of the accident attributed it to the failure of the mill owner, Verso, to remove ice and snow from the job site. PSAMF ¶ 91; DRPSAMF ¶ 91. After treating Injured C at a hospital, a physician's assistant prescribed certain work restrictions and noted an expected return to work in one to four days. PSAMF ¶ 92; DRPSAMF ¶ 92. For a couple of days after his injury, SW&B had Injured C sit in an office in the safety department instead of performing his regular duties. PSAMF ¶ 92; DRPSAMF ¶ 92.

SW&B did not list Injured C as an employee who had a work-related injury or illness on its OSHA 300 log for 2008. PSAMF ¶ 94; DRPSAMF ¶ 94. At some point in 2008, Phyllis Jones, Mr. Leavitt's assistant safety director, noticed that Injured C's name was not listed in the injury reports. PSAMF ¶ 93; DRPSAMF ¶ 93. She asked Darren Blanchard, who by then was SW&B's safety coordinator, why Injured C's injury was not listed. PSAMF ¶ 93; DRPSAMF ¶ 93. Mr. Blanchard informed her that the injury had been removed from the reports because the

---

[17] SW&B objects to Mr. Leavitt's statement of material fact paragraph 89 and requests to strike the affidavit of Phyllis Jones, on which it relies, because she was not identified as a person with knowledge in Mr. Leavitt's Initial Disclosure. DRPSAMF ¶ 89. This request is denied. Ms. Jones was identified in Mr. Leavitt's answers to SW&B's interrogatories. This satisfied Rule 26(e)'s supplementation requirement. *See* FED. R. CIV. P. 26(e).

accident was due to Injured C having a fit of anger. PSAMF ¶ 93; DRPSAMF ¶ 93. After the three recordable injuries occurred in the first quarter of 2008, Mr. Meek proposed to Mr. Leavitt and his Co-Safety Coordinator, Fred Dudley, that they ask Injured A, Injured B, and Injured C to sign statements saying they were not injured on the job so that SW&B would not have to report their injuries as OSHA recordable.[18] PSAMF ¶ 97; DRPSAMF ¶ 97.

After Mr. Leavitt's termination in June 2008, at least two additional SW&B employees were injured (Injured D and Injured E). PSAMF ¶¶ 107-108; DRPSAMF ¶¶ 107-108. Five days after Injured D's injury, Fred Dudley fired him for his failure to follow the proper procedure for lifting heavy objects. PSAMF ¶ 107; DRPSAMF ¶ 107. On August 8, 2008, Injured E injured his shoulder area working and received medical treatment for which he filed a workers' compensation claim. PSAMF ¶ 108; DRPSAMF ¶ 108. On August 18, 2008, he suffered an off-the-job injury, and SW&B did not allow him to return to work until he obtained a full release to regular duty for that non-work related injury. PSAMF ¶108; DRPSAMF ¶108. On October 24, 2008, SW&B terminated Injured E's employment, citing a reduction in work force. PSAMF ¶108; DRPSAMF 108. SW&B did not list Injured E as an injured worker on its OSHA 300 log for 2008. PSAMF ¶ 108; DRPSAMF ¶ 108.

## E.    Mr. Leavitt's Final Months at SW&B, His Termination, and the Aftermath

In March of 2008, Mr. Meek asked Fred Dudley, an SW&B safety coordinator out of Louisiana, to come to the Jay site. DSMF ¶¶ 5-6; PRDSMF ¶¶5-6. Mr. Meek

_____

[18] SW&B requests to strike this fact as irrelevant. That request is denied.

asked Mr. Dudley to come to the Jay site for two reasons: 1) the Verso Paper Mill was about to be shut down for maintenance, which would be a very busy time for SW&B, requiring additional employees and another safety coordinator; and 2) Mr. Meek wanted Mr. Dudley to be an extra set of eyes at the Jay site to help him figure out why the site's safety record had deteriorated and what might be done to correct it. DSMF ¶ 6; PRDSMF ¶ 6. Shortly after Mr. Dudley arrived at the Jay site, he was assigned to be a Co-Safety Coordinator with Mr. Leavitt. DSMF ¶ 7; PRDSMF ¶ 7.

Around the time of Mr. Dudley's arrival, SW&B was instituting a number of programs designed to investigate the reasons behind its deteriorating safety record and to improve safety at the Jay site. DSMF ¶ 4; PRDSMF ¶ 4. As part of that effort, Mr. Martin directed Mr. Leavitt and Mr. Dudley to prepare regular reports of craft and supervisor safety meetings. DSMF ¶ 13; PRDSMF ¶13. Due to some confusion, at least one of Mr. Leavitt's reports did not make it to Mr. Martin. PRDSMF ¶ 16; DSMF ¶ 16.

Mr. Dudley provided further reports to Mr. Meek, including things he had found when "nosing around after hours." PSAMF ¶ 95; DRPSAMF ¶ 95. At one point, Mr. Dudley took some of Mr. Leavitt's meeting reports and asked Mr. Meek "if this is the sort of thing you want me digging up." PSAMF ¶ 95; DRPSAMF ¶ 95. Mr. Dudley reported the following to Mr. Meek regarding Mr. Leavitt's job performance: that Mr. Leavitt had not implemented SW&B's safety manual and its safety procedures; that he was ignoring confined space safety procedures and that

he had written himself a reprimand for doing so; that employees had told him that Mr. Leavitt was sleeping on the job; and that Mr. Leavitt knew that employees were standing on a forklift, which was a safety violation, and had done nothing about it. DSMF ¶¶ 8-11; PRDSMF ¶¶ 8-11. Mr. Dudley told Mr. Meek that Mr. Leavitt was the worst safety professional he had ever seen and that Mr. Leavitt ought to be fired.[19] DSMF ¶ 12; PRDSMF ¶ 12. Mr. Meek testified that he had never assigned Mr. Dudley to read the notes of another safety coordinator, to report back on what he thought of his job performance, or to volunteer to do his job for him. PSAMF ¶ 95; DRPSAMF ¶ 95.

Since his employment with SW&B began in 2007, Mr. Leavitt had been implementing SW&B's safety manual and procedures on an ongoing basis. PSAMF ¶ 98. During the first quarter of 2008, Mr. Leavitt was working in the field as appropriate to carry out his responsibilities, and was spending the same portion of his work time in the field as he had in the past. PSAMF ¶ 99.

However, based on the events of the first quarter of 2008, Mr. Meek lost confidence in Mr. Leavitt's ability to perform as Safety Coordinator at the Jay site.[20]

---

[19] Mr. Leavitt denies each of the facts in the previous two sentences. However his denials and their attendant citations to the record only deal with whether Mr. Leavitt actually committed the allegations reported to Mr. Meek; they fail to rebut that Mr. Dudley made the reports. This is an important distinction. Mr. Meek made decisions regarding Mr. Leavitt's employment, so his perception of Mr. Leavitt's performance is perhaps more important than Mr. Leavitt's actual performance in this case. That Mr. Dudley made the reports to Mr. Dudley is effectively admitted.

Mr. Leavitt also seeks to strike Mr. Dudley's affidavit for SW&B's failure to identify him in its Initial Disclosures. *See Pl.'s Opp'n to Def.'s Statement of Material Facts* ¶¶ 8-12 (Docket # 25). However, like Mr. Leavitt's failure to identify Injured B, SW&B's late disclosure of Mr. Dudley was harmless. Mr. Dudley's identity, his position at SW&B, and his relevance to the case were revealed at the infancy of the litigation and have been referenced repeatedly throughout. Mr. Leavitt could have deposed Mr. Dudley but the record is silent on whether he did so.

[20] Mr. Leavitt denies this fact. However, not only does his refutation cite to his entire statement of additional facts in violation of Local Rule 56, the Court is unable to find any record support in those

16

DSMF ¶ 18; PRDSMF ¶ 18.  Although Mr. Meek was prepared to recommend Mr. Leavitt's termination earlier, he waited until late spring when the maintenance shutdown at the Verso plant would be complete and SW&B would be implementing a general reduction in force.  DSMF ¶ 19; PRDSMF ¶ 19.  In recognition of Mr. Leavitt's long service at the Jay site, Mr. Meek allowed Mr. Leavitt to be laid off so that he could receive unemployment compensation and would not have to report to potential employers that he had been terminated for performance reasons.  DSMF ¶ 20; PRDSMF ¶ 20.  Mr. Martin and Mr. Morgan agreed with this recommendation, and Mr. McKusick accepted it.  DSMF ¶¶ 2021; PRDSMF ¶¶ 2021.  On June 6, 2008, the day after Ms. Leavitt's counsel reached an agreement with BE&K and its insurers over her workers' compensation claim, SW&B terminated Mr. Leavitt's employment.  PSAMF ¶¶ 102-103; DRPSAMF ¶¶ 102-103.  Kenneth Morgan signed the Termination Authorization form and the employee evaluation.  PSAMF ¶ 103.  The Termination Authorization stated that the termination was due to a reduction of force, and the evaluation ranked Mr. Leavitt's performance as "more than expected" as to quality, productivity and job knowledge and as "fully adequate" as to attitude, safety, and adherence to policy.  PSAMF ¶ 103; DRPSAMF ¶ 103.

After Mr. Leavitt's termination, Mr. Meek offered Mr. Dudley the permanent position as Safety Coordinator at the Jay site.  DSMF ¶ 24; PRDSMF ¶ 24.  Mr. Dudley initially accepted but subsequently changed his mind because he did not

additional facts that refutes Mr. Meek's statement about his confidence in Mr. Leavitt.  The fact is effectively admitted.

want to stay in Maine.[21]  DSMF ¶ 24; PRDSMF ¶ 24.  He had been trying to reach an agreement with SW&B to allow him to return to his family in Louisiana since before Mr. Leavitt's termination.  PSAMF ¶ 111; DRPSAMF ¶ 111.  Mr. Dudley was on temporary assignment to the Jay site and was never listed as an employee on SW&B's employee roster for its Jay, Maine operation.  PSAMF ¶111; DRPSAMF ¶ 111.  Mr. Dudley and Mr. Meek recommended that Darren Blanchard be placed in the position of Safety Coordinator because of his outstanding performance at SW&B, including the fact that he had chaired the employee committee that helped the site obtain "star status" in the OSHA "Voluntary Protection Program."[22]  DSMF ¶ 25.  Mr. Martin agreed with that recommendation.  DSMF ¶ 25.

By June 21, 2008, Mr. McKusick had decided that SW&B needed to hire an additional safety coordinator, and he advertised an open position in the Lewiston Morning Sentinel that day.  PSAMF ¶ 104; DRPSAMF ¶ 104.  No one at SW&B contacted Mr. Leavitt to recall him to employment.  PSAMF ¶ 104; DRPSAMF ¶ 104.

On March 24, 2009, Mr. Leavitt filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), alleging discrimination based on disability, relationship with an individual with a disability, age, and retaliation.

---

[21] Mr. Leavitt denies that Mr. Dudley initially accepted, but his citations to the record do not support that denial.  PRDSMF ¶ 24.  His citations only support that Mr. Dudley hoped to return to Louisiana, which is consistent with SW&B's statement.

[22] Mr. Leavitt purports to deny this fact.  PRDSMF ¶ 25.  He cites his entire statement of additional facts as support.  The Court cannot find support for the refutation anywhere in Mr. Leavitt's statement of additional facts.  The only reference it makes to Mr. Blanchard is a conversation he had with Ms. Jones regarding injury reports.  Furthermore, Mr. Leavitt admits the statement that Mr. Martin agreed with the recommendation that Mr. Blanchard be placed in the position of Safety Coordinator.  Mr. Leavitt cannot reconcile his denial that the recommendation took place with his admission that Mr. Martin agreed with the recommendation.  The fact is effectively admitted.

PSAMF ¶110; DRPSAMF ¶ 110.  In response to this charge, Ms. Camp asserted that Mr. Leavitt was laid off because SW&B only needed two, not three, safety professionals to oversee the safety program at the Jay site.  PSAMF ¶ 112; DRPSAMF ¶ 112.

### F.    The Parties' Positions

#### 1.    SW&B's Motion

SW&B first argues that Mr. Leavitt fails to state a claim under the associational discrimination provision of the ADA.  *Def.'s Mot.* at 610.  It argues that Ms. Leavitt's disability could not have been the reason for Mr. Leavitt's termination because Mr. Meek and Mr. McKusick made the decision to terminate Mr. Leavitt and neither had any knowledge of Ms. Leavitt's disability.  *Def.'s Mot.* at 9.  It further contends that, even if Mr. Meek and Mr. McKusick had such knowledge, Mr. Leavitt's allegations do not fit into the three situations giving rise to claims under the association provision.  *Id.*  It argues that an employee only has a claim if (1) his spouse or relative "has a disability which is costly to the employer's health plan, and the employer terminates the employee to save on health insurance premiums"; (2) if the employee is associated with someone who has been diagnosed with a communicable disease that the employer thinks the employee might contract; or (3) if the "employee is terminated because the employer is concerned that the disability of a spouse or a child will distract the employee such that the employee will need some form of accommodation in the workplace."  *Id.* at 8.  SW&B refers to these three situations respectively as "expense," "disability by association,"

19

and "distraction." *Id.* It observes that there is no allegation that Ms. Leavitt had a communicable disease, that Mr. Leavitt's caring for his wife would distract him in his employment, or that SW&B attempted to save or saved any expenses because his wife settled her workers' compensation claim with BE&K. *Id.* 910.

SW&B next argues that Mr. Leavitt cannot state a claim under the retaliation provision of the ADA.[23] *Id.* at 1316. It contends that to state a claim under that provision, Mr. Leavitt would have to demonstrate that he was engaged in conduct protected by the ADA. *Id.* at 13. It argues that "[t]here is no allegation (nor could there be) that Mr. Leavitt's wife ever made a claim under the ADA, that she engaged in any conduct protected by the ADA, or that [Mr. Leavitt] testified in an ADA proceeding on her behalf." *Id.* at 14. It asserts that Mr. Leavitt merely testified at his wife's workers' compensation hearing, which "does not involve any conduct protected by the ADA or any investigation, proceeding, or hearing under the ADA." *Id.*

### 2.     Mr. Leavitt's Response and Further Argument

Mr. Leavitt responds that he has established a prima facie case of discrimination on the basis of association with a person with a disability, which he says consists of four elements:

> (1) plaintiff was qualified for his position; (2) he was subjected to an adverse employment action; (3) he was known at the time to have a relative or associate with a disability; and (4) the adverse employment

---

[23] SW&B also made an argument regarding Mr. Leavitt's Age Discrimination claim. *Def.'s Mot.* at 10-13. In Mr. Leavitt's response, he consented to summary judgment on his Age Discrimination claim and the portion of his retaliation claim pertaining to his heart attack and subsequent restrictions from work. *Pl.'s Reply* at 5-6. Accordingly, the Court grants summary judgment on those claims and does not recount the arguments pertaining to those claims.

action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision.

*Pl.'s Opp'n.* at 6 (quoting *Barker v. International Paper Co.*, 993 F. Supp. 10, 14 (1st Cir. 1998)).

Mr. Leavitt argues that his employment record at SW&B clearly establishes that he was qualified for his position. *Id.* at 7. He cites the positive evaluations and rewards he received throughout his employment with BE&K Construction and SW&B as support. *Id.* He argues that the reasons SW&B cites for his termination are inconsistent, are fabrications, and are genuinely in dispute in this case. *Id.* at 7-8.

As to the second element, Mr. Leavitt asserts that there is no dispute that he was subjected to an adverse employment action. *Id.* at 8. To the extent SW&B may try to argue that he left work voluntarily, Mr. Leavitt says he has plenty of evidence to dispute that assertion. *Id.*

Mr. Leavitt then argues that he has established the third element, that he was known at the time of his termination to have a relative or associate with a disability. *Id.* Mr. Leavitt lays out the nature of Ms. Leavitt's condition and asserts that he has an expert prepared to testify as to the limitations it places on her day-to-day life. *Id.* at 89. He argues that employees and agents of BE&K and SW&B, including at least Mr. Morgan, Ms. Partridge, and Ms. Camp, were aware of Ms. Leavitt's "injury and resulting disability" because of her workers' compensation claim. *Id.* at 910. He argues that, although Mr. McKusick stated that he does not

know when he learned about Ms. Leavitt's workers' compensation claim, a reasonable jury could find that he knew about her claim, and by implication her disability, prior to Mr. Leavitt's termination. *Id.* at 10.

With respect to the fourth element, Mr. Leavitt argues that a jury could find on this evidence that SW&B terminated Mr. Leavitt due to his wife's disability. *Id.* In his post-argument memorandum, Mr. Leavitt concedes that his associational claim does not fit any of the three categories outlined in *Larimer v. International Business Machines*, 370 F.3d 698 (7th Cir. 2004): "expense," "disability by association," and "distraction." *Pl.'s Post-Arg. Mem.* at 2. However, he contends that the associational discrimination provision should be applied broadly "to protect qualified individuals from adverse job actions based on unfounded stereotypes and assumptions." *Id.*; *Pl.'s Opp'n* at 10 (quoting *Oliveras-Sifre v. Puerto Rico Dep't. of Health*, 214 F.3d 23, 26 (1st Cir. 2000)). Instead of *Larimer*'s three factors, he urges the Court to adopt the "zone of interest" test the United States Supreme Court recently articulated in an ADA retaliation context in *Thompson*. *Pl.'s Post-Arg. Mem.* at 4–5 (citing 131 S. Ct. 863). He argues that, just as the retaliation provision was intended to protect both the disabled and their relations from retaliation, "Mr. Leavitt's close relationship to his wife puts him within the 'zone of interest' intended to be protected by the associational provision of the ADA." *Id.* at 5.

Mr. Leavitt further entreats the Court to consider SW&B's hostility toward Ms. Leavitt's workers' compensation claims as evidence of ADA discrimination. He directs the Court to *Quint v. Staley Manufacturing, Co.*, 172 F.3d 1 (1st Cir. 1999),

in which the First Circuit found an employer's failure to give an employee adequate notice of her rights under the Workers' Compensation Act could be evidence that the employer discharged the plaintiff with reckless indifference to her federally protected rights, entitling her to punitive damages. He states that "[i]f such conduct is sufficient to support a punitive damages claim, it is more than sufficient to make out a violation of the law." *Pl.'s Post-Arg. Mem.* at 2–3. He further asserts that "the notion that workers compensation concerns are tied into disability discrimination is also apparent in the legislative history of the ADA, which stated that "sociologists have identified common attitudinal barriers that frequently result in employers excluding individuals with a disability. These include concerns regarding . . . workers' compensation costs." *Id.* at 3–4 (quoting former 29 C.F.R. Part 1630, App. § 1630.2(l)).

Mr. Leavitt argues that consideration of SW&B's hostility to Ms. Leavitt's workers' compensation claim raises an inference that her disability was a determining factor in Mr. Leavitt's termination. He asserts that Ms. Leavitt's workers' compensation claim had a negative economic impact on BE&K and that "its resulting cost, as well as the idea that she was a 'liability,' was a motivating factor in [SW&B's] decision to terminate Mr. Leavitt's employment. *Id.* at 1112. He says this is evidenced by SW&B keeping a file on Ms. Leavitt's claim when it had no legitimate reason to do so and Mr. Morgan's questioning Mr. Leavitt about his upcoming testimony at his wife's hearing. *Id.* at 12. He also contends that the timeline of events raises an inference that Ms. Leavitt's disability was a

determining factor, noting that Mr. Dudley was hired months after Ms. Leavitt received a favorable decision from the workers' compensation board and Mr. Leavitt was terminated the day after Ms. Leavitt and BE&K had agreed to settle her claim. *Id.* at 1213. Finally, Mr. Leavitt argues that SW&B's treatment of other employees who were injured and had work restrictions in 2008 "support[s] . . . an inference that SW&B acted on unfounded stereotypes and assumptions as to persons with disabilities." *Id.* at 1315.

Mr. Leavitt further contends that SW&B's "inconsistent and shifting justifications for Mr. Leavitt's termination are evidence that the stated reason for his termination is pretextual, and the real reason is associational discrimination." *Id.* at 15. Mr. Leavitt observes that SW&B initially cited a reduction in force as the reason for his termination and now cites poor performance. *Id.* He asserts that he never received any written notice of any poor performance and that his record at SW&B reflects consistently strong performance. *Id.* at 1516. He argues that Mr. Dudley was hired to "dig up dirt" on him to establish a pretext for his termination. *Id.* at 16. Furthermore, he contends SW&B never had a commitment from Mr. Dudley to stay at the Jay site and was advertising for an open safety coordinator position within weeks of Mr. Leavitt's termination, undermining its argument that it needed to reduce its safety staff. *Id.*

Turning to his retaliation claim, Mr. Leavitt argues that there is a genuine issue of material fact as to whether SW&B retaliated against him based on "his advocacy on behalf of a person with a disability." *Id.* at 17. He asserts that his

"testimony on behalf of his wife on her worker's compensation claims for retaliation, which BE&K contested, falls squarely within the meaning of opposition to a practice made unlawful by the ADA." *Id.* at 18. Specifically, he contends that his testimony opposed BE&K's refusal to accommodate Ms. Leavitt's disability and termination of Ms. Leavitt due to a disability. *Id.* He further says that his testimony aided or encouraged Ms. Leavitt in the enjoyment of rights protected under the ADA. *Id.* at 1819. Mr. Leavitt compares this case to *Barker*, "which denied summary judgment to the employer where the employee had advocated for his wife in a[] [Maine Human Rights Commission (MHRC)] charge against the employer based on disability discrimination." *Pl.'s Post-Arg. Mem.* at 5. He asserts that the only distinction is that he advocated for his wife at a workers' compensation hearing, not in the context of a MHRA claim. *Id.* at 5–6. He contends that this distinction should not be controlling because "it was protected activity for Mr. Leavitt to protest his wife's termination because of her disability regardless of whether his wife ever filed a formal charge of disability discrimination. *Id.* at 6. Finally, he says that he sought an accommodation on behalf of his wife, which the *Barker* Court held constitutes protected activity. *Id.*

On the causation element, Mr. Leavitt argues that "the evidence supporting an inference SW&B terminated Mr. Leavitt's employment because of his protected conduct is the same as that discussed . . . on the associational discrimination claim." *Pl.'s Opp'n.* at 19.

### 3. SW&B's Reply and Further Argument

SW&B replies that "Mr. Leavitt has failed to meet his burden of offering admissible evidence proving the third and fourth requisite elements of his prima facie case under the ADA's association section." *Def.'s Reply* at 3. It argues that the third element is not met because it is undisputed that the person who recommended Mr. Leavitt's termination, Mr. Meek, had no knowledge of Ms. Leavitt's disability. *Id.* It argues that the fourth element is not met because the undisputed evidence establishes that Mr. Meek terminated Mr. Leavitt solely based on performance and not on "unfounded assumptions or stereotypes about persons with disabilities." *Id.* at 4. SW&B further argues that *Quint* does not contradict the weight of authority establishing that an association claim must fall within the category of "expense," "disability by association," or "distraction." *Def.'s Resp.* at 1–2. It asserts that *Quint* "has nothing to do with the Association Section of the ADA" and "merely deals with the type of evidence which may support a punitive damage claim under 42 U.S.C. § 1981a(b)(1)." *Id.* It reiterates that Mr. Leavitt cannot demonstrate that his claim is based on one of the three recognized categories of discrimination by association. *Id.*

SW&B further argues that Mr. Leavitt cannot establish that the reasons SW&B gave for his termination were pretexts. *Def.'s Reply* at 4. It notes that Mr. Meek received his information about Mr. Leavitt's performance from Mr. Dudley and others. *Id.* at 45. It contends that "Mr. Leavitt's denial of the accuracy of that information does not generate a material fact, since it is Mr. Meek's perception of Mr. Leavitt's job performance that informs the pretextual analysis, not whether the

information on which the perception was based was accurate or inaccurate." *Id.* at 5. SW&B argues that this establishes indisputably that Mr. Meek chose to terminate Mr. Leavitt based solely on performance reasons, entitling SW&B to summary judgment on the associational disability claim. *Id.*

Turning to the retaliation claim, SW&B argues that it "must fail based upon the clear and unambiguous statutory language." It contends that the retaliation provision of the ADA only protects (1) conduct that opposes acts or practices "made unlawful by *this chapter*" and (2) participation in "an investigation, proceeding, or hearing, under *this chapter*." *Id.* at 6 (quoting 42 U.S.C. § 12203(a)) (emphasis added by SW&B). SW&B argues that "[t]here obviously was nothing unlawful under the ADA with SW&B contesting Ms. Leavitt's state worker's compensation claim," so Mr. Leavitt's testimony "could not have constituted opposition to any act or practice made unlawful under the ADA." *Id.* (internal quotations omitted). Similarly, it argues that the state workers' compensation hearing was not a proceeding under the ADA, so it does not fit into the second form of protected activity. *Id.* It argues that section 353 of the Maine Workers' Compensation Act is the exclusive statute governing claims of retaliation based upon testimony in a workers' compensation hearing. *Def.'s Resp.* at 3–4.

SW&B also refutes Mr. Leavitt's assertion that *Barker* is on point here. *Id.* at 4–5. It contends that in *Barker* the court denied summary judgment because the plaintiff requested an accommodation for his disabled wife, which is a protected activity under the ADA. *Id.* (quoting *Barker*, 993 F. Supp. at 16). SW&B says there

is no evidence in this record to support Mr. Leavitt's assertion that he requested an accommodation for his wife. *Id.* It reasons that, even if there were such support, the request would have to have occurred before Ms. Leavitt's termination in 2002, and "no connection could possibly be inferred" between that request and his termination in 2008. *Id.* at 5.

Finally, SW&B contends that even if Mr. Leavitt could make out a prima facie retaliation case, the undisputed facts establish that Mr. Leavitt was terminated based on his performance, not his advocacy for Ms. Leavitt. *Def.'s Reply* at 7.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).[24] For summary judgment purposes, "'genuine' means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a 'material fact' is one which might affect the outcome of the suit under the governing law." *Buchanan v. Maine*, 469 F.3d 158, 166 (1st Cir. 2006) (quoting *Seaboard Sur. Co. v. Town of Greenfield*, 370 F.3d 215, 218-19 (1st Cir. 2004)) (internal quotation marks omitted). "Neither conclusory allegations [nor] improbable inferences are sufficient to defeat summary judgment." *Carroll v.*

---

[24] On December 1, 2010, while this motion was pending, an amended version of Rule 56 of the Federal Rules of Civil Procedure became effective. *See Farmers Ins. Exch. v. RNK, Inc.*, No. 09-2524. 2011 U.S. App. LEXIS 1255, at *8 n.4 (1st Cir. Jan. 21, 2011). Applying the amended version of Rule 56 to this case is "just and practicable" and would not "work a manifest injustice" because the amendments "do not change the summary judgment standard or burdens." *Id.*

*Xerox Corp.*, 294 F.3d 231, 236-37 (1st Cir. 2002) (citation and internal quotation marks omitted).

## B.     Discrimination by Association

The ADA provides that:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. 12112(a).   The associational discrimination provision of that section provides that the term "discriminate" includes "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."  42 U.S.C. § 12112(b)(4).

The associational discrimination section was intended "to protect qualified individuals from adverse job actions based on unfounded stereotypes and assumptions arising from the employees' relationships with particular disabled persons." *Oliveras-Sifre*, 214 F.3d at 26 (internal quotations omitted).  To establish a prima facie case under the associational discrimination provision, a plaintiff must prove by a preponderance of the evidence that (1) he was qualified for the job at the time of the adverse employment action; (2) that he was subjected to adverse employment action; (3) that his employer knew, at the time of the adverse employment action, that he had a relative or associate with a disability; and (4) that the adverse employment action occurred under circumstances raising a reasonable

inference that the disability of the relative or associate was a determining factor in the employer's decision. *Colon v. San Juan Marriot Resort Hotels and Stellaris Casino*, 600 F. Supp. 2d 295, 30506 (D.P.R. 2008); *Barker*, 993 F. Supp. at 14. Following the *McDonnell Douglas* framework, once a plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action. *Barker*, 993 F. Supp. at 14 (citing *McDonnell Douglas*, 411 U.S. at 80306 (1973)). If the defendant proffers such a reason, "the burden shifts back to the plaintiff to establish that the defendant's reason is merely a pretext for discrimination." *Id.*

### 1.    Qualified for the Job and Adverse Employment Action

The first and second elements of a prima facie case are easily met in this case. Mr. Leavitt's ten years of employment at BE&K and SW&B, his positive evaluations, and his awards are more than sufficient to establish that he was qualified for the job of safety coordinator. His termination—whether part of a reduction in force, performance-based, or discriminatory—was an adverse employment action because he did not leave SW&B voluntarily.

### 2.    Employer Knowledge of Relative's Disability

The Court finds that Mr. Leavitt has presented sufficient evidence to create a genuine dispute as to whether his employers knew of his wife's disability. Dr. Esponnette's testimony is sufficient to establish a genuine dispute as to whether Ms. Leavitt was disabled. PSAMF ¶ 62; DRPSAMF ¶ 62. Moreover, Mr. Leavitt has presented evidence from which a reasonable jury could infer that SW&B knew

she was disabled. There is evidence that Valerie Camp, in-house counsel for BE&K and SW&B, was closely involved in Ms. Leavitt's workers' compensation claims, and therefore knew about Ms. Leavitt's physical condition. PSAMF ¶66; DRPSAMF ¶ 66. Significantly, the record suggests that she conveyed information about Ms. Leavitt's claims to Mr. Morgan, one of Mr. Leavitt's supervisors. PSAMF ¶ 47; DRPSAMF ¶ 47. Moreover, there is evidence that Ms. Partridge kept a file on the claim in SW&B's offices. PSAMF ¶ 65; DRPSAMF ¶ 65. Although there is no evidence that Mr. Meek, the corporate Safety Director, knew about her disability, there is evidence that he conferred with individuals who did know about her disability before the final decision to terminate was made. Specifically, Mr. Meek conferred with Mr. Morgan and Mr. McKusick. DSMF ¶¶ 20-21; PRDSMF ¶¶ 20-21. Mr. Morgan followed Ms. Leavitt's workers' compensation claim from its early stages, PSAMF ¶¶41, 47; DRPSMF ¶ 41, 47, which raises the inference that he was aware of the worsening condition underlying her claim. Moreover, Mr. McKusick admitted to learning about Ms. Leavitt's workers' compensation claim at some point. PSAMF ¶ 65; DRPSAMF ¶ 65. Although he could not recall the precise time when he learned, this ambiguity leaves the issue in dispute and when viewed in the light most favorable to Mr. Leavitt creates a genuine issue of material fact. How much Mr. McKusick knew remains an open question, creating a further dispute as to whether he knew she was disabled. Because there is evidence that managers at SW&B had knowledge of Ms. Leavitt's disability, the third element of an association claim is met.

### 3. Determining Factor

The fourth element—determining factor—is the most difficult. The crux of Mr. Leavitt's claim is that Ms. Leavitt's workers' compensation claim and Mr. Leavitt's participation in it motivated SW&B's adverse employment action. There are two aspects of Mr. Leavitt's claim: 1) that SW&B terminated Mr. Leavitt because he testified before the Maine Workers' Compensation Board in support of his wife's workers' compensation claim against BE&K; and 2) that SW&B terminated Mr. Leavitt because it harbored an animus against workers like Ms. Leavitt who press workers' compensation claims against it.

### a. Mr. Leavitt's Testimony

Mr. Leavitt must cross a significant hurdle to demonstrate that his testimony at his wife's workers' compensation hearing raises an inference that his wife's disability was a determining factor in his termination. Courts in the First Circuit have repeatedly held that similar claims are cognizable in retaliation, not discrimination by association. *Oliveras-Sifre*, 214 F.3d at 26 (Where plaintiffs "contend, in essence, that they were punished for their advocacy on behalf of individuals with AIDS. . . . [s]uch a claim implicates the prohibition against retaliation . . . not the association provision"); *Barker*, 993 F. Supp. at 15 (Where "Plaintiff alleges that he was terminated because of his advocacy on behalf of his wife, and his wife's subsequent filing of a discrimination charge with the MHRC," "Plaintiff may be protected by the ADA's prohibitions against retaliation or coercion . . . . Plaintiff's allegations, however, do not fall within the scope of the ADA

association discrimination provision"); *Sifre v. Dep't. of Health*, 38 F. Supp. 91, 101 (D.P.R. 1999) ("Plaintiffs claim they were dismissed because of their advocacy on behalf of HIV/AIDS patients as part of their jobs at the Department of Health. Thus, Plaintiffs claims are not covered by section 12112(b)(4), but rather should be analyzed under the retaliation provision of Title V of the ADA"); *see Lester v. Compass Bank*, No. 96-AR-812-S, 1997 U.S. Dist. LEXIS 11575 *11 (N.D. Ala. Feb. 10, 1997) (stating that "[a]n individual who champions the cause of a disabled individual in the exercise of the disabled's rights protected by the ADA is most assuredly protected from reprisal or retaliation because of his acts. However the protection is provided by 42 U.S.C. § 12203(a)-(c), the prohibition against retaliation or coercion").

The First Circuit decision in *Oliveras-Sifre* is especially problematic for Mr. Leavitt. In *Oliveras-Sifre*, the plaintiffs who did advocacy work for persons with AIDS claimed their contracts were not renewed by the Puerto Rico Department of Health in violation of the ADA. 214 F.3d at 24. One of the plaintiffs' counts was under the "association provision" of the ADA, asserting that the ADA protected qualified persons from employment discrimination based on the "known disability of an individual with whom the qualified individual is known to have a relationship or association." *Id.* at 25–26 (citing 42 U.S.C. § 12112(b)(4)). The First Circuit agreed with the Department that the associational claim "fell short." *Id.* Because the plaintiffs contended "in essence, that they were punished for their advocacy on behalf of individuals with AIDS", the First Circuit concluded that "such a claim

implicates the prohibition against retaliation contained in Title V of the ADA, *see* 42 U.S.C. § 12203(a)-(c), not the association provision." *Id.* It is not much a leap from general advocacy for persons with AIDS to testimonial advocacy for an injured worker.

If *Oliveras-Sifre* represents binding precedent on this issue, this Court as an inferior court within the First Circuit must apply the holding.[25] The First Circuit has observed that "there may be occasions when court can—and should—loosen the iron grip of *stare decisis*." *United States v. Reveron Martinez*, 836 F.2d 684, 687 n.2 (1st Cir. 1988). However any such departure "demands special justification." *Arizona v. Rumsey*, 467 U.S. 203, 212 (1984). In *Gately v. Massachusetts*, 2 F.3d 1221, 1226 (1st Cir. 1993), *aff'g*, 811 F. Supp. 26, 31 (D. Mass. 1992), for example, the First Circuit upheld a district court's conclusion that, in light of recent Supreme Court decisions, there had been "considerable landscaping" that had changed the "contours of the law" since the last First Circuit opinion. In doing so, *Gately* noted that the district court had been faced with a "different set of facts" and "a newly crafted set of legal rules" and therefore the issue was one of "first impression" for the First Circuit. 2 F.3d at 1228.

A question is whether *Thompson* represents such a change so dramatic in the legal landscape to free this Court from *Oliveras-Sifre* and to make this question one

---

[25] It may be that *Oliveras-Sifre* is not a binding holding that this Court is compelled to apply. The advocates in *Oliveras-Sifre* spoke for a group of people—those with AIDS—and the First Circuit mentioned that they had not alleged "a specific association with a disabled individual." *Id.* at 26. Here, Mr. Leavitt's advocacy was for his wife alone. But *Oliveras-Sifre*'s main point was that because the plaintiffs alleged that they had been "punished for their advocacy", their claim did not "fit the framework" of the association provision. *Id.* Even if *Oliveras-Sifre* does not represent binding precedent, it is a statement of law from the First Circuit on an analogous case to which this Court owes respect.

of first impression within the Circuit. In *Thompson*, the United States Supreme Court addressed a sex discrimination charge under the Title VII of the Civil Rights Act. *Thompson*, 131 S. Ct. 863, 178 L. Ed. 2d 694, 698. Eric Thompson, the plaintiff, was engaged to be married to Miriam Regalado and both were employed at North American Stainless (NAS). *Id.* at 867. Mr. Thompson filed a charge with the EEOC, contending that NAS fired him to retaliate against Ms. Regalado's filing of a charge with the EEOC, alleging sex discrimination. *Id.* The United States Supreme Court first concluded that Mr. Thompson's status as Ms. Regalado's fiancé was a relationship close enough to potentially fit within Title VII's prohibition against third party reprisals. *Id.* at 868-69. Second, the *Thompson* Court concluded that Mr. Thompson was a "person aggrieved" within the meaning of Title VII because he was employed by the same employer as the original EEOC claimant and injuring him was the employer's intended means of harming the claimant; in the Court's phrase, Mr. Thompson was within the "zone of interests" sought to be protected by Title VII. *Id.* at 870.

Assuming that *Thompson* extends to the ADA, which it likely does, its teaching still does not reach the issue in this case. Mr. Leavitt's marital relationship with his wife is undoubtedly a relationship close enough to fit within Title VII prohibition against third party reprisals. *Id.* at 868 (stating that "[w]e expect that firing a close family member will almost always meet the *Burlington* standard"); *see Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1082 (10th Cir. 1997) (stating that "[a] family relationship is the paradigmatic example of a 'relationship'

under the association provision of the ADA"). SW&B has never claimed otherwise. Similarly, if Mr. Leavitt's allegations are credited, which they must be for purposes of this motion, he falls well within the "zone of interests" sought to be protected by the ADA. The issue here is whether, assuming he is a person aggrieved under the ADA, his advocacy for his disabled wife at a workers' hearing is cognizable under the discrimination by association provision of the ADA. Nothing in *Thompson* suggests that *Oliveras-Sifre* has been eclipsed.

Even assuming *Oliveras-Sifre* does not bind this Court on the issue of advocacy, Mr. Leavitt conceded that he does not satisfy any of the three *Larimer* categories. *Pl.'s Post-Argument Mem.* at 2. Although the First Circuit has not cited *Larimer*, its analysis of associational discrimination claims tracks the *Larimer* analysis. When explaining the scope of the associational discrimination provision, the First Circuit provided three examples of association discrimination from the EEOC's Interpretive Guidelines that reflect the three categories:

> (1) refusal to hire where the employer makes an unfounded assumption that the employee will miss work in order to care for a disabled relative; (2) discharging an employee who does volunteer work with AIDS victims, due to fear that the employee may contract the disease; and (3) denying health benefits to a disabled dependent of an employee but not to other dependents, even where the provision of benefits to the disabled dependent would result in increased health insurance costs for the employer.

*Oliveras-Sifre*, 214 F.3d at 26 (citing 29 C.F.R. Pt. 1630.8, App. at 360). These examples reflect the categories of "distraction," "disability by association," and "expense" respectively. The First Circuit wrote that association claims must "fit within this framework." *Id.*; *Dewitt v. Proctor Hosp.*, 517 F.3d 944, 947-48 (7th Cir.

36

2008); *Larimer v. International Business Machines Corp.*, 370 F.3d 698, 700-01 (7th Cir. 2004); *Trujillo v. PacifiCorp.*, 524 F.3d 1149, 1155-57 (10th Cir. 2008). Thus if the *Larimer* three category analysis applies, Mr. Leavitt has conceded his claim does not fit within any of these three categories.

In short, Mr. Leavitt's advocacy claim does not fit within the recognized categories for a cognizable associational discrimination claim and the Court is not convinced that the decisional law has changed since *Oliveras-Sifre*.

### a. Employer Animus

Mr. Leavitt has another argument. He contends there is sufficient evidence in the record about SW&B's excessive concern about its workers' compensation costs and its mistreatment of injured workers to support his claim that SW&B harbored hostility toward individuals with disabilities and that his termination reflected that animus. *Pl.'s Opp'n.* at 11-12. In his post-argument memorandum, he says that in *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1 (1st Cir. 1999), the First Circuit "discussed the interplay between the Maine Workers' Compensation statute and the [ADA]" and allowed an employer's violation of a state workers' compensation law to sustain a punitive damages verdict under the ADA. *Pl.'s Post-Arg. Mem.* at 2. He argues that "if such conduct is sufficient to support a punitive damages claim, it is more than sufficient to make out a violation of the law." *Id.* at 3.

Under the Maine Workers' Compensation Act, if an employer schedules an injured worker for a medical examination, the employee has the right to have his own doctor attend the examination. 39-A M.R.S. § 207. Maine law requires that

when the employer schedules the examination, it inform the employee of the right to have his doctor present. In *Quint*, an employer gave an injured employee only fifteen minutes notice of an examination and of her right to have her employer pay for her doctor's presence at the examination. 172 F.3d at 15. Moreover, the employer knew that the employee's doctor was actually away on vacation at the time. *Id.* When the employee became upset and cancelled the appointment, the employer fired her, citing "insubordination." *Id.* At the First Circuit, the employer argued that its violation of state workers' compensation law could not support a punitive damages award under the ADA. *Id.* The *Quint* Court wrote:

> [C]ontrary to Staley's contention the fact that the March 5, 1994 notice violated Maine law in no sense precluded a punitive damages award under the ADA. Section 1981a(b)(1) does not state "with reckless indifference to the[plaintiff's] federally protected rights, *and only those federally protected rights*." Thus, the jury rationally could conclude that [the employer] recklessly utilized Quint's alleged "insubordination" as an excuse for discharging her by reason of her disability.

*Id.*

This Court does not read *Quint* as saying that any employer violation of the Maine Workers' Compensation Act is evidence of an employer violation of the associational discrimination provision of the ADA. Otherwise, the ADA would become a federal forum in addition to the state workers' compensation system to resolve the endless disputes about work-related injuries between employers and employees. *Quint* is more nuanced. *Quint* says that the fact that the employer in *Quint* misused a provision of the Maine Workers' Compensation Act to recklessly

discriminate against its disabled worker because of her disability does not insulate the employer from the provisions of the ADA.

Mr. Leavitt's proposition is different. His claim is that SW&B discriminated against him because of his wife's assertion of a workers' compensation claim and because its workers' compensation costs were exorbitant. As proof, he wishes to demonstrate that SW&B discriminated against other work-injured employees. Under Mr. Leavitt's theory, the Maine's Workers' Compensation Act was not a vehicle by which SW&B committed ADA prohibited discrimination. The Maine Workers' Compensation Act and its expense was the motivating force behind SW&B's punitive actions against its employees. Mr. Leavitt's theory is therefore about expense, not about disability.

It is true that to make his ADA associational discrimination case, Mr. Leavitt uses ADA terminology—"unfounded stereotypes and assumptions as to persons with disabilities", *Pl.'s Opp'n.* at 13. But his language masks his true theory, which is that SW&B acted against its work-injured employees because they were costing it too much money, not because they were disabled. Thus, for example, Mr. Leavitt makes no showing that SW&B discriminated against disabled employees who did not suffer work-related injuries. In short, Mr. Leavitt takes *Quint* too far. The ADA is not designed as a federal workers' compensation system for injured workers and their spouses.

Even if the Court were to consider such evidence, to permit Mr. Leavitt to proceed with an associational discrimination claim on these facts would expand the

association provision beyond its judicially-recognized limits. Accepting the view that the scope of the associational discrimination provision is limited to "expense," "disability by association," and "distraction," Mr. Leavitt's claims are far too attenuated to fall within any of these categories. There is no evidence of either disability by association or distraction, leaving only expense. But as of the date of Mr. Leavitt's termination, Ms. Leavitt had finally settled her workers' compensation claim and as Mr. Leavitt conceded, "there would be no <u>additional</u> expense to Defendant once Tally Leavitt's workers' compensation claim was settled." *Pl.'s Post-Arg. Mem.* at 2. To generate a genuine issue of material fact, the factfinder would have to consider the workers' compensation expenses of SW&B employees other than Ms. Leavitt to conclude that SW&B discriminated against Mr. Leavitt because other work-injured employees had been expensive to SW&B. To state the proposition is to demonstrate its attenuated nature for purposes of the associational discrimination provision of the ADA.

In sum, Mr. Leavitt tries to shoehorn a retaliation claim into the limited associational discrimination provision. That effort must fail because he raised no genuine dispute as to whether he was discriminated against on account of his wife's disability.[26] Accordingly, the Court grants SW&B's motion for summary judgment on Count I, Mr. Leavitt's claim under the associational discrimination provision of the ADA.

### C. Retaliation

---

[26] Having found that Mr. Leavitt has failed to establish a prima facie case of discrimination by association, the Court does not address the issue of pretext.

The retaliation provision of the ADA provides:

No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. §12203(a).[27]  To establish a claim of retaliation under the ADA, a plaintiff must show (1) that he engaged in protected conduct, (2) that he suffered an adverse employment action, and (3) that there was a causal connection between the protected conduct and the adverse employment action.  *Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25, 35 (1st Cir. 2010).  If a plaintiff is able to make a prima facie case, the *McDonnell Douglas* burden shifting framework applies as described *supra* in the discrimination by association section.  *See Carreras*, 596 F.3d at 36.  "If the employer produced a legitimate reason for its [adverse employment] decision, the burden shifts back to the plaintiff to show that the motive was discriminatory [or retaliatory]."  *Id.* (internal quotations omitted).  "An ADA plaintiff may assert a claim for retaliation even if she fails to succeed on a disability claim."  *Freadman v. Metro. Prop. and Cas. Ins. Co.*, 484 F.3d 91, 106 (1st Cir. 2007) (internal citations omitted).

The Court has already concluded that SW&B subjected Mr. Leavitt to an adverse employment action, which satisfies the second element of retaliation.  The

---

[27] In his opposition to summary judgment, Mr. Leavitt also argues § 12203(b)'s prohibitions against interference, coercion, and intimidation apply to this case.  *Pl.'s Opp'n.* at 17.  Section 12203(b) is separate from § 12203(a) and Mr. Leavitt's Complaint does not reference it.  *See Compl.*  Mr. Leavitt does not argue that there is any substantive distinction between § 12203(a) and § 12203(b) that makes a difference in the facts of this case and therefore the Court's § 12203(a) analysis subsumes Mr. Leavitt's § 12203(b) argument.

Court focuses on whether Mr. Leavitt has established the first and third elements of a retaliation claim.[28]  Regarding the first element, the narrow question is whether either Mr. Leavitt or Ms. Leavitt engaged in protected activity under the ADA.

BE&K's opposition of Ms. Leavitt's claims for workers' compensation benefits in 2003 and 2005 was not unlawful under the ADA.  Employers routinely challenge workers' compensation claims, and deeming such challenges discriminatory or retaliatory would deter such challenges and allow employees to collect benefits at will.  Therefore, by testifying in the workers' compensation proceeding in opposition to SW&B, Mr. Leavitt was not opposing any act or practice made unlawful by the ADA.  *See Deghand v. Wal-Mart Stores, Inc.*, 926 F. Supp. 1002, 1015 (D. Kan. 1996) ("The plaintiff offers no factual or legal basis for how she could reasonably believe that an employer violates the ADA when in the exercise of its statutory rights the employer appears in a state workers' compensation proceeding and opposes the disabled employee's application for benefits.").

Other federal courts have rejected that filing a workers' compensation claim constitutes protected activity under the ADA.  The United States District Court for

---

[28] Preliminarily, the Court returns to *Thompson*.  The Supreme Court's construction of § 2000e-5 of Title VII in *Thompson* seems clearly to apply with equal force to the ADA.  The enforcement provision of the ADA reads:

> The powers, remedies, and procedures set forth in section[] . . . 2000e5 . . . of this title shall be the powers, remedies, and procedures this subchapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment.

42 U.S.C. § 12117(a).  Because the ADA incorporates Title VII's enforcement provisions by reference, it is logical that the Supreme Court's constructions of those provisions be incorporated as well.  Accordingly, like the fiancé in *Thompson*, Mr. Leavitt has a cause of action if he can establish that he was retaliated against for his wife's ADA protected activity.

the District of South Carolina stated that "while being retaliated against for filing a workers' compensation claim could certainly constitute a cause of action under state law . . . , it does not constitute protected activity under the ADA." *Coker v. International Paper Co.*, Civil Action No. 2:081865DCNBM, 2009 WL 6057269, at * 8, (D.S.C. Sept. 23, 2009), *report and recommendation adopted by* C/A No. 2:081865-DCNBM, 2010 WL 1072643, (D.S.C. Mar. 18, 2010); *see also Mosley v. Potter*, Civil Action No. H052816, 2007 WL 1100470, at *9 (S.D. Tex. April 11, 2007); *Fleury v. New York City Transit Authority*, No. 02CV5266 SJF LB, 2004 WL 2810107, at *5 (E.D.N.Y. Dec. 8, 2004), *rev'd in part on other grounds*, 160 Fed. Appx. 34 (2nd Cir. Dec. 15, 2005); *Johnston v. Henderson*, 144 F. Supp. 2d 1341, 1354 n.5 (S.D. Fla. 2001). If filing a workers' compensation claim is not ADA protected activity, it is not ADA protected activity to testify to support a claim.

Nor does the fact that Mr. Leavitt testified at a workers' compensation hearing in support of Ms. Leavitt's workers' compensation discrimination claim make a difference. The Maine Workers' Compensation Act discrimination provision and the ADA retaliation provision address different prohibited actions. The Maine Workers' Compensation Act prohibits employers from discriminating against an employee "for testifying or asserting any claim under this Act." 39-A M.R.S. § 353 (emphasis supplied). The ADA retaliation provision prohibits discrimination against "any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing

under this chapter." 42 U.S.C. § 12203(a) (emphasis supplied). By testifying in support of Ms. Leavitt's workers' compensation discrimination claim, Mr. Leavitt was not testifying in a hearing under the ADA; he was testifying in a hearing under the Maine Workers' Compensation Act.

With this said, it is theoretically possible—as occurred in *Quint*—that the employer's actions violate both acts: the employer could use workers' compensation procedure as a vehicle to discriminate under the ADA. The question is whether there is sufficient evidence in this record to raise a genuine issue of material fact on this narrow question.

There is not. Mr. Leavitt testified twice before the Workers' Compensation Board on behalf of Ms. Leavitt: May 24, 2004 and September 12, 2007. It was at the 2004 hearing that Mr. Leavitt testified that Mr. Morgan and others pressured him to return Ms. Leavitt to work in her regular job rather than in alternative assignments, and that there were alternative work assignments that BE&K could have offered her. PSAMF ¶ 56; DRPSAMF ¶ 56. The Court assumes *arguendo* that this testimony, even at a workers' compensation hearing, could be ADA protected since the First Circuit has held that requesting an accommodation for a disability or complaining about a refusal to accommodate is protected conduct under the ADA. *Carreras*, 596 F.3d at 35-36; *Guzman-Rosario v. United Parcel Service, Inc.*, 397 F.3d 6, 11 (1st Cir. 2005). Viewing the facts in the light most favorable to Mr. Leavitt, his 2004 testimony could have been a complaint about a failure to accommodate, potentially cognizable under the ADA. *See* PSAMF ¶ 56; DRPSAMF

¶ 56. The same cannot be said for Mr. Leavitt's 2007 testimony. *See* PSMF ¶ 68; DRPSAMF ¶ 68. There, he merely related the state of his wife's health and even viewing that testimony in the light most favorable to Mr. Leavitt, there is nothing that transforms run of the mill workers' compensation testimony into the assertion of a claim under the ADA.

Assuming that this one portion of Mr. Leavitt's 2004 testimony was protected activity, there is no evidence of a causal connection between that testimony and his termination. Most significantly, there were over four years between the testimony and his termination. PSAMF ¶¶ 56, 103; DRPSAMF ¶ 56, 103. The Court could find no case in which a four year interval between action and retaliation was deemed a sufficient temporal proximity to sustain a prima facie case. *DeCaire v. Mukasey*, 530 F.3d 1, 19 (1st Cir. 2008) (finding a temporal proximity when all the relevant events took place within a year); *Rhoades v. Camden Nat'l Corp.*, 575 F. Supp. 2d 260, 262 (D. Me. 2008). Moreover, in that time, Mr. Leavitt received pay increases and consistently positive evaluations, and BE&K recognized him for his work in its publications. PSAMF ¶¶ 33, 39; DRPSAMF ¶¶ 33, 39. This included high praise from Mr. Morgan, the only one of Mr. Leavitt's supervisors who arguably knew about his 2004 testimony. PSAMF ¶¶ 3339; DRPSAMF ¶¶ 3339. Such praise is entirely inconsistent with any long-term scheme to terminate Mr. Leavitt under the pretext of poor performance. There are no facts to suggest that SW&B's or BE&K's treatment of Mr. Leavitt changed in any temporal proximity to

his 2004 testimony, and his further advocacy of his wife through 2007 did not amount to protected conduct that could serve the basis of a retaliation claim.

Because the only conduct by Mr. Leavitt that could be construed as protected activity under the ADA was his 2004 complaint about BE&K's failure to accommodate his wife's restriction, and because there is no causal connection between that activity and his termination, Mr. Leavitt has failed to establish a prima facie case of retaliation. Accordingly, the Court grants SW&B summary judgment on Count III of Mr. Leavitt's claim.

## III.  CONCLUSION

The Court GRANTS Defendant SW&B Construction Company LLC's Motion for Summary Judgment on all counts (Docket # 16).

SO ORDERED

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 25th day of February, 2011